This is the Department of Corrections. May it please the Court, my name is Richard Koh and I represent the appellant, Rodney Burns. I would like to reserve two minutes for rebuttal. Defendants have not appealed the District Court's... You weren't involved in the Burns 1 case, were you? I was not, Your Honor. Defendants have not appealed the District Court's determination that Mr. Burns' conviction in this case was unconstitutional. The only evidence offered against Mr. Burns' disciplinary hearing was the investigating officer's hearsay summary of two unidentified informant statements. The hearing officer advocated her duty to serve as an independent tribunal and failed to ask for any... What should she have done here? In your submission, what should the hearing officer have done? And we can break it down into parts. Part of it is, and frankly we haven't discussed this, the thing that bothers me the most is the video. It may or may not exist. It's summary judgment and there's kind of a two-part subtext to that that we can get into. But from your position, what should the hearing officer have done? Your Honor, I think there's three things that she should have done. The first is with respect to the confidential informants, I think she had to create a record of these informants' reliability and credibility. How do you do that? How do you put on the record? Because if the hearing officer's suspicion is right, the minute she puts on the record who the confidential informants are, there's a real problem in that institution. There's a real problem. I agree, Your Honor. That record does not need to be shared with the inmate. I think in Henderson, this court conducted an in-camera review of that record related to a confidential informant. And that may have been appropriate here if, for some reason, the hearing officer or investigating officer had some concerns about it. So you're saying the hearing officer said to Dolman, who are these two people you're talking about? And then does the hearing officer talk to those two inmates also? Or is it enough that the hearing officer gets the names of two people from Dolman? I think it would be more than names, Your Honor. I think she would also have to ask about specific facts as far as, in what cases in the past have these informants provided reliable information? How did you determine that these were? You're almost getting to a gate standard, aren't you? I think it's basically the same standard, Your Honor, as it would be in a criminal case, correct? You're relying on the Helms v. Hewitt case. That's correct, Your Honor. Helms v. Hewitt. And that basically says, look, if you're going to rely in these types of proceedings on confidential informants, you need to put on the record that the informant's credible or reliable and what that statement was, why you believe that person was reliable, or persons in this case were reliable, and what their statements were without necessarily, definitely without identifying them. Correct, Your Honor. The problem is, if you don't do that, is the problem we have here. When the hearing officer was deposed in this case, she had no recollection whatsoever of what facts she relied upon to determine that these informants were reliable or credible. And actually, the investigating officer, Captain Doman, specifically said, I did not provide her with those facts. I would never provide her with those facts. I would not even provide a district court judge with those facts. This is about the prior reliability. When did that first come in? Was that a deposition or was that at the hearing? I think that would have been at – I think she had the opportunity to do this in this case, Your Honor. But at some point it got on the record that these – I guess there were two of them – had previously given information to Doman that Doman found and checked out. Correct, Your Honor. I think probably the right approach would have been what the Seventh Circuit recommended in Hensley, that she should have created a – Where did that come from and when? I'm sorry, Your Honor. Where did that come from and when? It's on the record now that Doman has, I think, at least on two occasions, or two confidential informants, gotten information from them that he, Doman, found to be reliable. And you're saying that didn't come out at the hearing officer's deposition? It didn't come out at Doman's deposition? And it also didn't come out – Where did it come from? When did it come out? It never came out, Your Honor. It's in the brief. It's not in the appendix. Maybe I'm misunderstanding your question, Your Honor, but the first thing that happened was Captain Doman spoke in camera to the hearing officer before the misconduct hearing. Right. And there was mixed testimony on sort of what facts came out. The hearing officer thinks that she did ask some questions about reliability and credibility, but she can't remember what those questions were or what the answer was. And Captain Doman testified in his deposition in this case that he did not provide that information to the hearing officer. Well, what Judge McKee is asking is there's two CIs who have some record, which I guess Doman felt that these guys were reliable. When they snitched, their information was reliable. Where is that exactly? You refer to it. Is it in ADEPT? His statement that he thought that these informants were reliable? It's on page 9 of your brief. And you cite to, I think it's Exhibit 19, say that the two sources of information have given reliable information in the past and saw him commit the assault, saw Burns commit the assault. I'm trying to find out where that came from. Captain Doman did testify to that at his deposition, that these informants were reliable. The problem here is he never communicated the basis for that conclusion to the hearing officer, and we would argue that based on Helms, the hearing officer has independent duty to assess the credibility and reliability of those unidentified informants. Just make sure we get our facts straight. Did Doman and Canino, the hearing officer, have a conversation prior to the March 10 misconduct hearing, or did they have an in-camera conversation on March 15 after the in-camera hearing when Burns said, look, there are tapes of this, I want to see those tapes, I want them here. She then paused the hearing for five days. Your Honor, there's a hearing on – Did she talk with Doman before March 10? No, Your Honor. At the March 10th, she talked to him before the March 15th, the continuation of the disciplinary hearing. Okay. So they didn't have any conversation before March 10. Correct, Your Honor. Okay. Going back to your Chief Judge McKee's original question, what were the other two errors, I didn't plan to spend much time on the other two, but we would also say that the State has a burden of coming forward with a correctional security justification after the refusal to call a witness. Here they didn't even ask. That's easy. It's obvious. It really is easy. That's almost a reciprocatory. I mean, the guy doesn't want to get hurt. Well, I think she has to ask him that question. Actually, the victim here, Mr. Mobley testified he was not afraid of Mr. Burns. What's he going to say? What in the world is Mobley going to say? Assuming that Burns is the one who ---- Threw the scalding water. Threw the scalding water. And what is Mobley going to say? Look, I don't want to testify because I'm terrified of this guy. He's going to do me in if I testify against him. He's going to say, I'm not afraid of Mr. Burns. Mr. Burns is a very fine fellow. I'd like to sit down and have tea with him as soon as we get out of this place. What's he going to say? Well, Your Honor, he also testified that it wasn't Mr. Burns who committed the assault on him. Pardon me? He doesn't think that Mr. Burns committed the assault on him. He identified another inmate that committed the assault. So if he doesn't think Mr. Burns committed the assault, then there's no reason for him to be afraid of Mr. Burns. What would you have a hearing officer do in this circumstance? I would just have her ask that question, Your Honor. Ask which question? To Mr. Mobley, why don't you want to testify? But you really are creating a situation. You're almost asking us to suspend our knowledge of reality and what a prison is like and assume that we're talking about a bordering school for gifted children. And you're saying that Mr. Mobley should be asked, and I guess in front of Burns, since he does have some procedure to process protections, why he, Mobley, does not want to testify against Burns. And you're expecting that in the real world, Mobley will say something other than, Well, because I'm terrified of Mr. Burns. He got me once, and I'm still here to talk about it. I'm not going to give him a second chance to do me in. Whatever he says will be the product of free, unfettered articulation on his part, not because he's afraid to say anything against Burns inside of a prison. Your Honor, I understand the concern that, of course, prison officials need to have the discretion to deny a witness if they're concerned about that witness's safety. But I think, at a minimum, the State at least has to ask that question. The concern raised by the Seventh Circuit in Forbes is it might be more actual a different case when the victim actually wasn't accusing the person who's been charged with the offense. Because if you just allow them to not testify with no explanation, they could bring serious charges against another inmate, and then they don't even have to testify at the hearing or provide any justification for not wanting to testify. Your Honor, the reason I wasn't planning on spending too much time on this issue is I think if you agree with us on the confidential informant issue, I still think you could grant us the relief that we've requested in a brief. Well, again, we haven't discussed it. I'm not sure that's as strong an issue as the videotaping issue. Exactly. And then because the district court found in your favor with respect to a violation concerning the way that Canino handled the matter concerning the confidential informants. She didn't really put it on the record. She didn't say that they were reliable. She didn't say why they were reliable. But the question here is, after that, do they have qualified immunity, these defendants? We haven't got into that. But before we do, let's go to the videotape. You've got, it would seem that you have a fairly decent argument here. Videotapes are preserved for 60 days. Correct, Your Honor. You have an incident that occurs on February 11th. I believe it's the 10th, Your Honor. February 10th, February 11th, there's an assault. The interview with Dolman takes place about a week later on February 18th. Correct, Your Honor. And there's conflicting versions of that. Dolman said, we have you on tape. Burns purportedly says, well, then fine. Show me the tape. The hearing, the misconduct report is filed on March 7th. The hearing is on March 10th. And because February is a short month, so this is only four weeks later. It's about 28 days. What would your better argument be that you should have at least Canino looking at the videotape of what happened in that room in that afternoon as to whether anything shows somebody throwing scalding water on Mobley? Absolutely, Your Honor. I think under this Court's decision in Young, the State was required to provide exculpatory evidence to Mr. Burns. And based on the investigating officer's statement that this tape showed the assault, I think he was entitled to see it. He made a timely request for the tape. The defendants have not come forward with any correctionals. There's an argument that necessarily he shouldn't see it because he might see who the confidential informants are if they're on the tape. But there's no explanation as to why the tape was not produced when clearly it had not been taped over 28 days later because we were within the 60-day period that they have tapes in use. Absolutely, Your Honor. And this tape was the key evidence, or a portion could have been key evidence, as to who possibly did the throwing of the scalding water on Mobley. And to add one more fact in there, Your Honor, between his first meeting with Captain Doman on February 18th and writing the misconduct report on March 7th, Captain Doman looked at that tape according to his testimony. So he had actually pulled this tape and reviewed it, and he's offered no explanation as to why. I would agree with you that if he offered a correctional security justification, he would not have to show that tape to Mr. Burns. But I think even with a correctional security justification, he would still have to show it to the hearing officer. You cited Young. Didn't that deal with disclosure of exculpatory evidence? Can this videotape be considered exculpatory evidence, and why? I think it can be considered exculpatory, Your Honor. First of all, we have to – We don't know what it says. We don't know what it shows. I don't know why you're putting in a grady kind of requirement. You don't care whether it's exculpatory. It's probative. And you're saying that your procedural due process protection requires you to see it because it's probative. Maybe it will be the thing that totally sinks your client. Maybe it will be exculpatory. But he's got a right to have the hearing officer look at it and consider it. The minute you start putting the word exculpatory in there, then it seems to me you've got a burden to show it's exculpatory and can't do that because you never saw it. And I don't know why you're going so far as to push that exculpatory rock up a hill. You don't need to do that, I don't think. I see my times, Your Honor. Go ahead. I would agree that even if it's not exculpatory, we were entitled to see it. But I would also say – The hearing officer should have looked at it, maybe not see it. Or the hearing officer could see it. Correct, Your Honor. But Captain Dolan testified that the assault was on the tape. He later testified at deposition in the case that if Mr. Burns was the one who committed the assault and that was on tape, he would have produced the tape at the hearing. So the fact that the tape showed the assault, but he didn't show it at the hearing, I think the inference can be drawn is it showed someone else committing the assault and, therefore, would be exculpatory. Thank you. Did you set a time for rebuttal? I did, Your Honor. Okay. Thank you. Mr. Tessaro? May it please the Court. I'm Claudia Tessaro from the Attorney General's Office on behalf of the Apple East. Maybe you could start with the tape as to was the tape in existence, still preserved as of the time of the hearing on March 10th? The only evidence I recall about that is the 60-day reusing cycle. So the presumption is that it exists. So it probably did exist. In a sense, Canino is uncertain as to whether she saw it. I think Canino didn't see it. I think she said she didn't see it. Well, she paused the hearing. She paused the hearing to try and obtain it, if I recall, but I don't. And then Doman said there was nothing on it? Doman said there was nothing on it, yes. Well, why isn't that a big problem? Although the deposition is, I mean, she's all, I mean, at times she gets amnesia in testifying, but so be it. Why wouldn't she at least look at the, or demand to see the videotape? Well, she's not going to disclose a confidential informant. No, I don't think that was the problem. I think she was willing to obtain it, but when she attempted to get it, it either was not given to her or it was given to her, but she didn't see anything on it. Either way. Was it requested within the appropriate amount of time? I mean, Judge Ambrose went through a timeline. It should have been available, right? You were on notice that that was something that might be, people might want to look at it, right? Well, at that point there wasn't a misconduct charge even. There was just a pending matter being investigated. I think what Mr. Koh failed to mention and what I think is important here is this Court's decision in Griffin v. Spratt, which makes the point that the procedures that are normally utilized in a criminal proceeding are not expected to be used in a misconduct. No, we all understand that. We all understand that. We got it. But the point here is that purportedly there was a February 18 conversation between Dolman and Burns. Dolman said, according to Burns, and I guess this is what, on summary judgment? It is. It was a summary judgment. And so we really have to take what he says, that Dolman says to him, we have you on videotape as having thrown the scalding water in Mobley's face. And Burns said, I said, that's not true. You know, get the videotape. Now, if it clearly had shown, remember somebody else was charged initially. Well, not charged, investigated. Or investigated. And that person was exonerated. So if what we have that we, for purposes of summary judgment, is that Dolman's saying we have you on videotape, don't you have to produce the videotape? I don't think there's any law that says that. And I think it is, I disagree with your dismissal of the Griffin case. According to the appellant's brief, it's in Appendix Exhibit 3, that Dolman advised Canino the assault was not recorded on the videotape. It's summary judgment. You've got Burns alleging, and it has to be taken as true at this stage, that Dolman told him, Burns, that the assault was captured on the videotape. And he was the guy. What is the problem with Canino looking at the videotape? There isn't a problem if there had been a tape. But I don't think you can infer that there was such a tape. Well, when Dolman says to Canino the assault was not recorded on videotape, that suggests to me that there was a tape. And as Dolman is saying, the assault was not recorded on it, which is not the same as saying there was no videotape. Dolman didn't say, look, there's no videotape, for whatever reason. The cameras weren't working, or he didn't say that. He said, according to Exhibit 3, that Dolman advised Canino the assault was not recorded. So why shouldn't Canino have to, he may be telling the truth, he may not be telling the truth. Why shouldn't Canino have to look at the videotape and see whether or not the videotape shows Burns throwing the skulls in Walter as Burns said Dolman told him. And again, in summary judgment, we have to take that as true. Or that the videotape shows absolutely nothing. I think you have to look at all the statements that were made about the video in combination, and I think the only... On summary judgment, we have to look at what Burns says about the videotape and take it as true. But if that statement is true, it wouldn't have helped matters at all. Well, it may not. We're not talking Brady here, and that was my concern with Mr. Coe's posing this in terms of exculpatory evidence. We don't know if it would have helped matters at all. It may have shown Burns with a pot of skull in Walter tossing it on Mobley. It may have shown somebody else, Holmes or his cellmate, tossing it. It may have shown something totally different. We don't know. But the point is we have a hearing which almost takes on the semblance of a Kafkaesque proceeding where the hearing officer is basically talking to one party, hearing something from that party, and then deciding, okay, well, there's nothing on the videotape. I'm not going to look at that. The informants, well, they're reliable. That's enough. And it's supposed to be a hearing with some rudimentary aspect of procedural due process. It's not supposed to be a sham proceeding. Of course, no proceeding that is conducted should be a sham proceeding. But I think we're getting away from a very important aspect of this case that hasn't been touched on yet at all. And that is, on the first appeal of this case, the majority held that even though no money had been taken from Mr. Burns, he still had a right to security in his account, and that was a potential deprivation of due process if it wasn't accomplished with proper procedures. So the case was sent back to decide what procedures were due in that context. And in that context, we're raising, as I'm raising, the issue with whether or not the procedures that were due under the 14th Amendment, which is the reason we remanded it, would include Canino making an inquiry about this videotape. I understand that that's the point that you're raising, but I think that we have to realize that the type of inquiry that you're talking about is the type of inquiry that at most would have been inferable in the universe where Wolf v. McDonnell procedures apply. And as we tried to explain in our brief, that very assumption about how this misconduct hearing should have been conducted is not borne out because Wolf v. McDonnell and the cases that follow it did not involve deprivations of property. If you're going to try to distinguish between deprivation of property and deprivation of liberty, you can go there if you want. Basically, what Wolf is saying is that inmates have due process rights. It's not as much as somebody who's on trial for a possible crime, but they do have certain due process rights. And the point here is, just from a street smarts perspective, Canino, who paused the hearing on March 10th when she heard that there was this tape, five days later purportedly meets with Dolman. He tells her there is no tape. Well, should she have investigated further? Should she ask why? Because normally that tape would have been in existence for at least until around this first or second week of April. I wish we had a better deposition transcript and record from Mary Canino. It would make all of our jobs a lot easier. And I can't explain to you why, when she asked about the tape and Dolman said he didn't have it, she didn't go further. The reality is that if Ms. Canino's decision, her eventual decision, based on whatever minimal amount of evidence you think she had in front of her, had not had in it the words, assess inmate's account, we wouldn't be here. I'm sorry, say that again? I'm sorry. If the reason, the trigger for the previous finding that there was a property interest implicated here because of the right to security and so on, all arises because Ms. Canino's decision said in it, in her handwriting, assess inmate's account for medical expenses of Mobley or words to that effect. Now, if she had not written that phrase on the decision, what we would find ourselves with would be an inmate misconduct scenario without any property interest having been implicated. I have no idea how that helps. That's the saying, if the Big Bang hadn't happened, we wouldn't be here either. I don't get that at all. Are you saying that this is immaterial? Is this issue immaterial to our? I believe it is. I think the reason that we are here is that because of the way the confidential informant part of the hearing was handled, which the appellees chose not to cross appeal on, we have already a finding that there was something wrong with that hearing. And the question then is what relief. The process was due. That's where we were a few minutes ago. You told me yourself when you suggested that we were getting off track here that Burns 1 was a remand back to the attorney. We held that there wasn't interest in the inmate's account. We analogized it to being a judgment creditor at that point, and that was novel. And I understand that there's an issue of qualified immunity there because it was a novel hearing. But nevertheless, we sent it back to determine what process was due under the 14th Amendment to this hearing that had already occurred. That got us, at least me, to the point of wondering whether or not the process that would have been required under the 14th Amendment required Canino to do something other than accept Dorman's representation. No, I don't worry about the videotape. When Burns is saying on summary judgment, and we have to accept that, that Dorman told him, Burns, that they had him on videotape throwing the water on Moberg. And I'm still trying to struggle with it. It sounds like you're trying to distinguish between a property interest and a liberty interest. That's where I thought you were going. And it seems to me that's totally contrary to the Brodby-Taylor U.S. Supreme Court case in Hudson. That distinction you're trying to make just won't fly. I think that the question of how much process is due when an inmate's property interest is at stake has to be analyzed like any other due process issue, as you suggest. And that would take us to a Matthews v. Eldridge approach. What process is due in a case like this? We're going into it. The day the misconduct report was written, nobody would have anticipated that property was going to become the key. But they wouldn't have had to because Canino had to find out what was simple. The whole property thing and Judge Smith's incredibly erudite and eloquent opinion in Burns 1, none of that had to exist. All Canino had to know her job was was to find out, do I believe by a preponderance of the evidence Burns threw scalding water on Moberg? It's really simple. That was it at the hearing, right? No, I don't. At the initial hearing, wasn't that the only issue? Did Burns throw water on Moberg? That was it, right? Right. Okay. In the course of trying to make that inquiry, forgetting the stuff about economics theory and the security interest in the account, forget all that. If I'm Canino and I know I've got to figure out whether or not it can be established by preponderance of the evidence Burns, the inmate, threw water on Moberg, the other inmate, I'm told, wait, there's a videotape that captured the incident. Maybe, just maybe, if there's a videotape capturing the incident, I should look at the videotape. Perhaps it'll tell me something about the incident. Perhaps it'll tell me that Burns threw water on Moberg. Perhaps it'll tell me Burns did not throw water on Moberg. I need to look at the videotape. It's simple. Your Honor, I understand that statement, but that is not constitutionally required. An inmate, to reach that conclusion, the net result would be that you would afford far greater procedural protection to an inmate like Burns facing a deprivation of property than inmates currently have when they're facing a deprivation of liberty. That's B. Taylor. You can make that argument if you want, and it's Husband v. Palmer. I don't know. I don't think that's, that's not how I view it, Your Honor. Humor me. Just, okay, humor me because I had to get up super early this morning. Just pretend, just pretend that I'm right about this, and it doesn't matter whether or not you're talking about a deprivation of property versus a deprivation of liberty, that the 14th Amendment embodies some modicum of protections, and it doesn't matter what the nature of the deprivation is. Just have fun with me and humor me, all right? I understand that. Make me feel better it's almost the weekend. Help me get through Saturday with this. And explain to me how due process does not require Caneo to do something about this videotape that might answer the very purpose of her inquiry. Did Burns throw water on Mobley or did he not throw water on Mobley? I'm sorry if I sound like I'm repeating myself, but this Court has already held that the obligations of a hearing officer and of correctional system do not include preserving evidence. We're not talking about preserving evidence. The evidence was there. Well, it does call for preserving evidence if it's done in bad faith. Well, there's no indication of that. This is within the 60 days, so there's not an issue of spoilation here, all right? Or at Griffin, excuse me. But the point is we don't know. What we have is summary judgment here, and we have a statement that we have to accept that on February 18, Dolman told Burns that we have you on videotape. Doesn't, at the very least, Dolman have to preserve the videotape for purposes of at least showing it to the hearing officer? I know of no constitutional basis for requiring that in the setting of a prison misconduct hearing. I understand that there's a logic and a surface appeal to how wouldn't it be useful to see it, but it's not a constitutional requirement. The basis for Canino finding that there was a violation, an assault that took place by Burns on Mobley, and she based it on the confidential informants, and the district court found that the confidential informants, that this was a constitutional violation because she did not place on the record why the informants were credible and the actual statements that they gave to Dolman, then doesn't Burns win? Burns already won on that very ground. On declaratory judgment. Yes. Burns won on the declaratory judgment. That was all the relief he was entitled to as far as we're concerned. You're arguing that Canino should get qualified immunity because while there may have been a violation or a constitutional violation, according to the district court, it was not a violation of clearly established law. Correct. Why doesn't Helms v. Hewitt set out clearly established law? Because that is not the reason for the violation of the confidential informant. That is not the reason why there was a due process interest at stake in this case at all. And there is no clearly established law that up forwards the rights that are articulated in the Helms v. Hewitt document on the record. Correct. Note the identity of the informant. That wasn't done here. Correct. District court found that was a violation. How is Canino entitled to qualified immunity if the, that law has been in effect for the last 27 years, because the reason from our perspective that this case even requires an informant is that the property interest was at stake and that was a matter decided of first impression in Burns 1. So you're saying you had Burns 1 not happen, that Burns would not be entitled to any protection whatsoever at a prison disciplinary hearing. That's where you're going with that argument. Well, I'm saying that the law has shifted over time significantly. Listen to the question and answer the question. I'm sorry. Are you saying that absent Burns 1, when we created the security interest in the devaluation of an account, that at a prison disciplinary hearing where the quote only close quote thing at stake is the defendant's liberty inside the institution, that he's entitled to no procedural protection whatsoever under the 14th Amendment. That's the argument you're making. I think that is the gist of Sandin and all the cases that come after it. And that's why, it's my understanding, that's why Burns' counsel did not pursue the due process deprivation of liberty theory in the Durster Court originally once Sandin and that line of authority was briefed and argued in the defendant's first motion for summary judgment. So even if he was going to receive, we go back to good time which you were trying to use to create the distinction between property interest and liberty. Even if he could be, even if he could lose his good time as a result of this prison hearing, assuming that he could, that could happen, he'd still not be entitled to any due process at all at the prison disciplinary hearing. No, that's not what I meant to say because if good time had been at stake, it's a different ball game. But no good time was at stake in this case or in any typical Pennsylvania inmates misconduct case. But what happened here is the person lost his job. He got sent from what, Grateford to Huntington? Right. And he had additional expenses that he had to incur as a result of that. I mean, so his life in prison was turned upside down. Well, that happens a lot in misconduct cases. You're arguing that's Sandlin and that's not a big deal. Excuse me? You're arguing that's Sandlin and that's not a big deal. Sandlin O'Connor, you're arguing. That that's one of the normal incidents of prison life. That's correct. In fact, there's deposition testimony from Captain Doman that even if there hadn't been a misconduct at all, the incident itself would have resulted in a separation and recommendation to transfer Mr. Burns. So we really would be overstating it to say that there was any kind of liberty interest in this case. This circumstance that Mr. Burns found himself would have been exactly the same and he would have had no constitutional recourse given that no liberty interest was at stake. If there were good time in the Pennsylvania correctional system, I agree that the Wolf approach to the hearing would apply. But there is no good time in Pennsylvania. So to allow for Mr. Burns to assert a due process right along the lines we were discussing earlier, in this case where there was no liberty interest at stake and the property interest was minimal, would be contrary to the Sandlin line of authority. Why waste everyone's time with the hearing? If he has no rights under Sandlin to any procedure of depression, why waste everyone's time with this sham? Without talking about this particular hearing, I think the reason that hearings are given is at this stage a policy decision that to continue them even though the constitutional mandate requiring them has no longer got the same force that it once did. It's my understanding that It's a matter of institutional policy you're saying. Yes, it's good for keeping people's morale up because they have a chance to contest things and sometimes, for heaven's sake, some misconduct hearings result in findings in favor of the inmate. Those aren't the ones that come to this court. Those are probably the ones where they see the videotape. I don't know that they ever show videotapes at misconduct hearings, frankly. Speaking of the videotape, did you check or make any inquiry as to what happened to this videotape? I personally did not, no. So you're just accepting that at March 15th, purportedly Dolman told Canino that it didn't show anything or we don't have it anymore, whatever. She didn't see it. That's what the record indicates, and that's all I personally have worked with. All right. Thank you. Okay. Ms. Tresor, thank you very much. Thank you. Mr. Cohn? Maybe you can start by addressing her Sandlin argument. You can start by addressing her Sandlin argument. Yes, Your Honor. I think to address that argument, I think it all goes back to this distinction between property and liberty interests, and I think you have to go back to Wolfe to answer that question. Are you buying the distinction? Am I totally wrong about that? Absolutely not, Your Honor. I think if you look at Wolfe, one of the questions in Wolfe was whether a liberty interest was enough to give due process protection to inmates, and the Wolfe court said that it was, and actually in reaching that determination, it said basically liberty interests are equally as important as property interests and that the analysis of a liberty interest should parallel a property interest. I think even the Wolfe decision says that the procedures in Wolfe apply even if it's a, whether it's a property deprivation or a liberty deprivation. Let me ask you. It would appear in this circuit you've got a pretty tough hill to climb. You've got the Griffin case, which says that if there is evidence that is not available or destroyed, but there isn't an indication that it was destroyed in bad faith, there is no due process violation. Then there's another case called U.S. v. Boyd, which is not cited in anyone's brief. It's a case from around 1991-92. It's a 961 Fed Second, I think it's 434, in which there was a person who was convicted of having a tainted urine sample showing drugs. There were 50 urine samples taken. Only one of those urine samples showed the presence of drugs. And that urine sample was destroyed arguably inadvertently. And what our court said is, unfortunately, there's nothing we can do because it doesn't look like, there's no evidence that it was destroyed in bad faith,  how can you win in that context? There is, and this really comes back to Judge Chigares' question at the outset, the tape, we don't know what's on it. So we cannot say today that that tape is exculpatory, so it has to be given to him. The only claim can be that it should have been reviewed by Canino. If, however, and we have no way of proving it, if, however, that tape was for some reason destroyed or did not show anything on it relating to the incident on February 10th or 11th, what basis do we have on this record to go forward and say, okay, there's been a constitutional violation such that there should be a remedy given? Your Honor, I don't think this is a spoilation case. I think a point you made earlier. You know, this is not a case where the – This is a case where evidence was, for whatever reason, destroyed, but we don't know if it was in bad faith. We just don't know. I guess my point is, Your Honor, it wasn't destroyed at the time of – It may be a spoilation now. I'm not sure if they preserved it or not. It may be a spoilation now. It may be a spoilation issue now, but I think the issue is, Your Honor, they had a duty before that disciplinary hearing to provide that tape to Mr. Burns. They didn't do that, so that's the violation, was not giving Mr. Burns his documentary evidence. I see my time is up. If I could just very briefly touch on the brief. Go ahead. You had Mr. Sargo for a little bit. Go ahead. You didn't say briefly. Yes, Your Honor. This is not a lawyer's briefly. This is a real-time briefly. I think the district court got it wrong by tying the relief to the property interest. I think the correct analysis is you tie the relief to the constitutional right, and I think that's what Carrie says. There's different relief for procedural due process violation or different relief for First Amendment violation. Procedural due process case, you look at what compensation is due to my client because of this unconstitutional conviction. Among other things, he lost his job as a result of this conviction. That loss of job is mandatory. If you're convicted of a Class I misconduct in Pennsylvania, you're required to lose your job, so it's a direct result. He didn't even have a right, even in the state law, and that's the same one again. He didn't even have a right to a prison job. So how does that – you're arguing a constitutional remedy for the deprivation of a job that he had no right to have. Your Honor, we're not challenging that he got fired for his job. We're challenging that he was unconstitutionally convicted of an assault and what relief is appropriate for that constitutional violation. I understand you're saying that, and I think the law supports you, that the deprivation occurs with the due process violation, not with the loss of the job. But if you then tie the remedy to the loss of the job and not the due process violation, you're asking us to impose a remedy for a right that he never really had. I was going to ask you, what is the remedy that would get to you? I think it's almost like you don't have a right to sue your boss if he fires you if you're not a well-employed, but if your boss hits you with a car, you're entitled for the lost wages for the time of work you missed while you were injured and out of work. So I think the issue is what compensation would be necessary. Is that the best analogy you can come up with, Mr. Coe? You've been sitting there for about 45 minutes. Yes, Your Honor. Is that the best you can do? I think the issue here, Your Honor, is that the judge got the law wrong where he said you have to somehow tie the relief to the property interest that Mr. Burns is deprived. And I think that the judge went along with defendants in trying to make this a case about $10. But it's really a case about Mr. Burns' constitutional rights being violated. Thank you. Thank you. And I want to also compliment Counselor Pro Bono on this case. And I want to thank you. And which firm are you with? Trinker. Trinker-Bentley. Trinker. And please pass it on. I know these things flow downhill in big firms. Pass it on to whoever at the top is having it flow down to you. And please give him or her our thanks. It's not a flow down, it's a dump down. Thank you, Your Honor. Give him or her our thanks, too. We really do appreciate the work that you do on these cases. Both counsels did a very good job, and it's greatly appreciated. Thank you very much. Take a brief break and take the matter under advisement.